IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

ROBERT STEVEN REITZ,           §
                                   §
      Plaintiff,                §
                                   §
v.                                §      Civil Action No. 1:16-CV-0181-BU
                                   §
JIMMY WOODS, *et al*.,         §
                                   §
      Defendants.         §

## MEMORANDUM OPINION AND ORDER

On September 4, 2015, at approximately 2:15 p.m., the Abilene Police Department 911 call center received two back-to-back phone calls from an unidentified male using a blocked phone number. In the first call, the caller reported, "I just shot my girlfriend." And then added, "I used a 9 mm to shoot my girlfriend right in the f*cking eye." When asked by the dispatcher for his address, the caller provided a street address to an Abilene apartment complex, an apartment building number within that complex, and an apartment number. The dispatcher lost contact with the caller after trying in vain to get the caller to identify himself or provide his phone number. But within minutes, the caller phoned back and said, "I need to speak to a hostage negotiator. My girlfriend is tied up in the bathroom right now." He also reported that in addition to the 9 mm handgun, he had a 12-gauge shotgun and an M-16 rifle. When the dispatcher asked if he was inside the apartment, he acknowledged that he was and replied, "I'm near the front door. I'm waiting for the police to start knocking so I can start shooting."

Multiple officers from the APD responded to the apartment. Given the exigent circumstances involving a reported gunshot victim, a SWAT team made a forced entry into the apartment. Once inside, the officers discovered that there was no gunshot victim or other emergency. The sole occupants of the apartment were the plaintiff, Robert Steven (Bobby) Reitz, and his dog. The only gun found by the officers was a Sig Sauer pellet gun.

When questioned by police officers, Reitz denied knowledge of the 911 calls and appears that day to have cooperated with the investigation of the incident. Following an on-scene investigation, Reitz was taken by Officer Jimmy Woods, the primary officer on the scene, to the Abilene police station, known as the Law Enforcement Center.

Once at the LEC, Reitz consented to a search of his cell phone and an APD agent attempted to download the phone's contents using a CelleBrite digital forensics system. The download did not yield anything of evidentiary value, other than the fact that the non-emergency telephone number for the APD was saved twice in Reitz's phone. However, the agent was unable to download Reitz's call history due to either the phone's age or its operating system. Ultimately, the forensic analysis failed to yield conclusive evidence whether Reitz had recently called 911.

Woods, having insufficient evidence to continue holding Reitz, returned him to his apartment.

Approximately two weeks later, Reitz returned to the LEC to obtain a copy of the police report. While there, he happened to meet a news reporter with the local KTAB television station. The reporter recalled the September 4 events and asked Reitz if he would

allow her to do a story about those events. Reitz agreed to cooperate with the reporter and eventually submitted to an interview. Part of Reitz's claims in this lawsuit are that the APD officers, fearing negative publicity for their roles in the September 4 events, tried to suppress the KTAB news story by threatening Reitz with prosecution if he did not cooperate in killing the story.

The KTAB news story aired on October 13, 2015, in both televised and on-line versions. Approximately two weeks later, following further investigation of the September 4 events by the APD, led by Detective John R. Wilson, Reitz was charged with a Class A misdemeanor offense of making a false alarm or report based on the 911 calls.[1] The charging document for this offense was a probable cause affidavit signed by Larry Tatum, an Investigator with the Taylor County District Attorney's Office. Wilson arrested Reitz on that charge on October 28, 2015. However, the case was later dismissed by the DA's Office after further investigation cast more doubt on whether Reitz made the 911 calls.

Reitz filed this lawsuit against Woods, Wilson, Tatum, and Taylor County for civil rights violations under 42 U.S.C. § 1983. All of the defendants have filed motions for summary judgment which have been fully briefed. *See* Dkt. Nos. 73–78, 89–91, 96–98, 101–02, 105.

Because the parties have consented to the magistrate judge conducting all further proceedings in this case (*see* Dkt. Nos. 46, 86, 106), the undersigned has full authority

---

[1] As discussed below, Reitz was initially identified as a suspect in a case involving a Terroristic Threat in violation of Section 22.07 of the Texas Penal Code, a felony, which includes threats to commit violence with the intent to cause emergency response officials to respond. *See* Dkt. No. 78-1 at 4–13. However, the ADA later instructed that the case be refiled as a False Report case, a Class A misdemeanor. *Id.* at 42.

under 28 U.S.C. § 636(c) to issue a final judgment.

After considering the motions, briefing, summary judgment evidence, applicable law, and oral arguments of the parties, the Court grants Defendants' motions and dismisses all claims against them.

## I. PROCEDURAL BACKGROUND[2]

Reitz initially filed this lawsuit against the City of Abilene, Woods, Wilson, and Tatum. *See* Dkt. No. 1. Following various motions to dismiss (Dkt. Nos. 15, 16, 19), Reitz amended his Complaint (*see* Dkt. No. 21), which led to further motions to dismiss. *See* Dkt. Nos. 26–28. After considering those latter motions, the Court dismissed all claims against the City and select claims against the other defendants, including an excessive force claim against Woods and all claims against Woods and Wilson brought against them in their official capacities. *See* Dkt. Nos. 39–40.[3]

Reitz later filed a Second Amended Complaint (*see* Dkt. Nos. 58, 59) and the Court eventually accepted a Third Amended Complaint (Dkt. No. 67), which remains Reitz's

---

[2] Prior to the parties consenting to proceed before a magistrate judge, Magistrate Judge Frost issued a report and recommendation addressing numerous issues raised in the three motions to dismiss and the district judge adopted the findings and conclusions in full. *See Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2017 WL 3046881 (N.D. Tex. May 25, 2017) (recommendation of Mag. J.) *adopted by* No. 1:16-CV-181-C, 2017 WL 3034317 (N.D. Tex. July 17, 2017). In that recommendation, the Court addressed many of the issues which are now presented in the context of summary judgment.

[3] *See Reitz*, 2017 WL 3046881 at *11. Although the Court did not dismiss the official capacity claims against Tatum at that time, Reitz's current pleading characterizes the claims brought against Tatum as individual capacity claims. Further, the Court notes that Tatum's employer, Taylor County, has been named as a defendant in this lawsuit. Any official capacity claims against Tatum would be duplicative with those brought against the County. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (noting that an official capacity suit is "another way of pleading an action against an entity of which an officer is an agent"); *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001) (finding that when plaintiffs bring suit against both an entity and individuals, courts properly dismiss the official-capacity claims as duplicative).

operative pleading. *See* Dkt. No. 87.[4] Through that pleading, Reitz sues Woods, Wilson, Tatum, and Taylor County for damages under 42 U.S.C. § 1983 for alleged violations of his First, Fourth, and Fourteenth Amendment rights. Dkt. No. 67 at 2–5. Reitz sues the defendant officers in their individual capacities and sues Taylor County under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) (holding that municipal entities, including counties, can be liable under § 1983 when a policy, practice, or procedure of the entity is the moving force behind a violation of federally protected rights). *See id.* at 3 n.2. Reitz also seeks declaratory relief against all defendants. Dkt. No. 67 at 101–02.

More specifically, Reitz sues Woods for unconstitutionally detaining and arresting him on September 4, 2015, for attempting to intimidate him into not cooperating with the news reporter, and for covering up police misconduct in connection with the September 4 events. *Id.* ¶ 59(b)–(c).

Reitz sues Wilson for unlawfully arresting him on October 28, 2015, for taking actions leading to his arrest on phony charges in retaliation for his cooperation with the KTAB news story, and for attempting to cover up police misconduct. *Id.* ¶ 60(b)–(c).

Reitz sues Tatum for failing to properly investigate the contents of the probable cause affidavit he signed and for "swearing to a false affidavit" that led to Reitz's arrest on October 28, 2015. *Id.* ¶ 61(a)–(c).

Reitz further claims that all three officers acted "in a manner that was negligent and not in conformity with the standard of conduct to be expected of a reasonable law

---

[4] *See Reitz v. City of Abilene*, No. 1:16-CV-0181-BL, 2018 WL 5634931 (N.D. Tex. Oct. 31, 2018).

enforcement officer." *Id.* ¶¶ 59(a)–(c), 60(a), 61(a)–(c). Reitz also alleges that Wilson and Tatum were "grossly negligent." *Id.* ¶¶ 60(a), 61(a)–(c).

Reitz sues Taylor County under a municipal-liability theory under *Monell* for Tatum's signing of the allegedly false affidavit in accordance with an unconstitutional policy, practice, and procedure of the County, and because the County, through the DA's Office, ratified his allegedly unconstitutional conduct. *Id.* ¶ 62(a)–(d). Reitz further alleges that in maintaining unconstitutional policies, Taylor County "was negligent, and grossly negligent, and acting in a manner not in conformity with the standard of conduct to be expected of a reasonable law enforcement office or agency." *Id.* ¶ 62(b).

Woods, Wilson, and Tatum argue that Reitz's claims are barred by qualified immunity. Dkt. No. 73 at 1; Dkt. No. 76 at 1. Tatum and Taylor County argue that there is no evidence to establish one or more elements of Reitz's claims. Dkt. No. 73 at 1; Dkt. No. 89 at 1.

On March 23, 2021, the Court held a non-evidentiary hearing and received oral argument on the summary judgment motions. *See* Dkt. Nos. 110, 111.

## II.  FACTUAL BACKGROUND[5]

Reitz grew up and currently resides in New Jersey. However, at all times relevant to this case, he lived in the Abilene apartment where the September 4 events took place. Dkt. No. 96-2 at 76. As previously noted, the APD 911 call center received two phone calls

---

[5] The following facts are drawn from the parties' pleadings, briefs, and evidence filed in this case. To the extent any fact is disputed, it will be so stated. Additional facts will be added as necessary with respect to particular motions.

on September 4, 2015, at approximately 2:15 p.m., from an unidentified man using a blocked phone number. Recordings of those calls are included in the summary judgment record. *See* Dkt. No. 78-1 at 1. Although the identity of the 911 caller remains unknown to this day, Reitz's apartment address, building number, and apartment number were specifically identified by the 911 caller as his address. *See id.* at 1, 8–9, 34.

Woods was among several officers dispatched to Reitz's apartment complex in response to the 911 calls. Upon arriving, he joined other officers in creating a perimeter around the apartment building. *Id.* at 46.

It appears undisputed that the officers believed that a person's life was in immediate danger inside the apartment.[6] *See id.* at 8–9, 45, 106, 115–16. Given those exigent circumstances, the APD SWAT team made a forced entry into the apartment without a warrant. *Id.* at 104. As stated above, officers found Reitz inside the apartment, but no gunshot victim or weapon other than the Sig Sauer pellet gun. *Id.* at 8–9; 23–24.

Woods remained on the perimeter during the forced entry and did not enter the apartment with the SWAT team. *Id.* at 46. Wilson, as a detective in APD's Crimes Against Persons Division, had not yet been assigned to the case and was not present at the scene that day. *Id.* at 42.

After the SWAT team made entry into Reitz's apartment, Officer Austin Graves handcuffed Reitz and escorted him to a patrol car. *Id.* at 8. Woods heard over his radio that

---

[6] At the summary judgment hearing, Reitz's counsel conceded the existence of exigent circumstances, at least insofar as the entry into Reitz's apartment and his initial detention in the immediate aftermath of the entry.

the SWAT team had entered the apartment, that no injured person was found, and that a suspect had been apprehended. *Id.* at 46. Following orders from superiors, Woods collapsed the perimeter and reported to the apartment. *Id.* Once at the apartment, a SWAT team member informed Woods that the suspect was in a patrol car. *Id.* Later, an officer moved Reitz to Woods's patrol car. *Id.* Woods first encountered Reitz while he was detained in his patrol car. Dkt. No. 96-2 at 76–77.

Woods was the primary officer on the scene and, because no victim was found in the apartment, he was "tasked with compiling information and drafting a report regarding the false 911 call." Dkt. No. 78-1 at 46. Woods spoke with Reitz, who explained that he had returned to his apartment around 1:15 p.m. that day from a weekly meeting with his psychiatrist. *Id*. at 9. Woods also spoke with a neighbor who lived in an apartment above Reitz's apartment. *Id.* The neighbor, who worked as a nurse at the same mental health facility where Reitz's psychiatrist practiced, reported that Reitz "acts kind of weird all the time" and that Reitz had a girlfriend who was seen coming and going from the apartment. *Id*.

Speaking with Reitz again, Woods confirmed that Reitz previously had a girlfriend, but the relationship ended within the past year after Reitz reported her to the police for stealing from him. *Id*. Reitz told Woods that he had not seen his ex-girlfriend since December 2014, approximately 10 months prior to the September 4 events. *Id.*

Because a specific address had been given by the 911 caller, and because Reitz was the only occupant found at that address, Woods believed he had probable cause to suspect

Reitz of making the calls. *Id.* at 46. Woods inspected Reitz's phone at the scene but was unable to locate a log of deleted calls. *See id*. As explained above, Reitz was then taken by Woods to the LEC for a more comprehensive search of his phone. *Id.* Reitz remained handcuffed while being transported and for most of the time while at the LEC. Dkt. No. 96-2 at 77. Because Reitz was being detained in connection with the investigation, he was not free to leave. Dkt. No. 78-1 at 62.

At the LEC, Woods gave Reitz's phone to Agent David "D.D." Gray who is trained in using the APD's CelleBrite digital forensics system. *Id.* at 49–50. After attempting to download data from Reitz's cell phone, Gray noticed that "the system was not able to download the call history of the phone." *Id.* In his affidavit provided in the summary judgment evidence, Gray states that he believes the problem downloading Reitz's call history "was due to either the age of the cell phone, or its software." *Id.* Gray further explains that,

> [r]egardless, the CelleBrite system did not support this type of phone, and the download did not show what calls were made or received, to or from whom, and when they were made or received. The download did show that the subject phone twice had the non-emergency number saved in its Contacts.

*Id*. Gray informed Woods that the call history could not be recovered but that "this did not conclusively show this phone did not place a phone call to 911 on that day." *Id.* at 50.

Believing he had insufficient evidence to support Reitz's continued detention or to charge him with a crime, Woods returned Reitz to his apartment that same day. *Id.* at 46–47. Later that day, Woods completed a report that listed Reitz as a suspect in an investigation of a Terroristic Threat in violation of Section 22.07 of the Texas Penal Code

(*see* Dkt. No. 78-1 at 4–13), which includes threats to commit violence with the intent to cause emergency response officials to respond. *See* Tex. Penal Code § 22.07(a)(1). There is no evidence that Woods was involved further in the investigation of Reitz or the September 4 events, nor is there evidence that Woods communicated with Wilson during the latter's investigation of Reitz.

On September 9, 2015, five days after the 911 calls, Wilson was assigned the case for further investigation. Dkt. No. 78-1 at 42. Wilson reviewed the file, including Gray's report reflecting the failed attempt to download the call history from Reitz's phone. *Id.* Wilson also listened to the recorded 911 calls and concluded the caller had a distinct New Jersey accent. *Id.*

Reitz's return to the LEC for a copy of the police report two weeks after September 4 was his first contact with the police since those events. *Id*. at 125–28. Reitz claims he saw Woods at the LEC that day (Dkt. No. 96-2 at 77) and asked to speak with him, but was told by a person at the front window that Woods had gone to lunch (Dkt. No. 78-1 at 126). Reitz claims that Woods saw him, "clearly appeared to be distressed" by Reitz's attempts to speak to him, and tried to "scurry away." Dkt. No. 67 at 42.

Stacie Wirmel, then a news reporter at KTAB, overheard Reitz in the LEC, recalled the September 4 events, and followed him out of the station to speak with him. Dkt. No. 96-2 at 7–10, 77. Reitz claims that Wirmel had also seen Woods trying to avoid Reitz in the LEC, but the summary judgment evidence fails to support this, or that she had even seen Woods that day. *Id*. at 9.

After speaking with Wirmel, Reitz returned to his apartment, called Woods, and, not reaching him, left a message. Dkt. No. 78-1 at 126. Although Reitz claims that Woods was trying to avoid him at the LEC, Reitz admits that Woods returned his call "shortly after" he left the message. *Id.* According to Woods, they spoke about the police report and the damage to the apartment. *Id*. at 47. Reitz also questioned Woods about why the box on the police report for "Forced Entry" was checked "No," and Woods explained that the forced entry was referenced in the report's narrative section. *Id*.

Reitz testified by deposition that nothing else was discussed during his call with Woods. *Id*. at 127. Woods claims he had no further discussions or contact with Reitz after that call, which appears to be undisputed. *Id.* at 47. However, in an affidavit submitted in opposition to summary judgment, Reitz reasserts claims from his Third Amended Complaint that Woods "was very abrasive with [him] on the phone" and "seemed to know that [he] was communicating with the reporter." Dkt. No. 96-2 at 78. Reitz explained:

> Officer Woods told me that I had not seen him at the police department that day because he had been on patrol away from the police department all day long, but I had seen him and I told him that I remembered I had seen him. He got really mad at me on the phone and was threatening and told me that I needed to understand that I had not seen him that day. What I got from this was that he did not want me to tell the news reporter or anyone else that I had seen him, or could identify him, or that he had anything to do with detaining me, and I also got the impression very clearly from the way officer [sic] Woods communicated with me that Officer Woods did not want me telling a reporter about what had happened to me. This was very scary to me.

*Id.*

Notwithstanding Reitz's interpretation of this conversation that Woods did not want to be identified as having been involved in the September 4 events, Woods clearly identifies

himself in his report as the officer who detained Reitz on September 4 and conducted the on-scene investigation into the events that day. *See* Dkt. No. 78-1 at 9–10. It also appears undisputed that Reitz continued to communicate with Wirmel, the news reporter, notwithstanding Reitz's impression that Woods did not want him to do so. Dkt. No. 96-2 at 78.

Reitz also claims he "was apprehensive because after Officer Woods had called in a threatening way [he] started getting scary phone calls from" another member of the APD, Wilson. *Id.* Regarding Wilson, Reitz claims that:

> Detective Wilson . . . called several times and he was always abrasive and frightening and threatening. Sometimes he called and left messages and I did not call him back, but other times he called and I spoke with him. He kept giving me a hard time and he made it clear that he did not want me to be cooperating with the reporter. This was frightening to me. He even threatened me. He wanted me to try to "kill" the news story. I could tell that from the way he was talking to me. When I was not doing what he wanted he told me that he would find some [w]ay to charge me with a crime. He was telling me that if I did not cooperate with him he was going to get me charged with a crime and I would be prosecuted and I would end up in jail. That was frightening to me.

*Id.* at 78–79.

According to Reitz, he received his last phone call from Wilson on October 13, 2015, "the morning of the same day when the KTAB news story [about the September 4 events] actually ran." *Id.* at 79. During that call, Reitz claims that Wilson "was especially aggressive and threatening." *Id.* Reitz claims that Wilson told him that he "needed to help him to get everything taken care of to his satisfaction, and he made it clear that if [Reitz] did not cooperate with him he would charge [Reitz] with a crime." *Id.*

After Reitz's call with Wilson on October 13, Wirmel called Reitz and told him she was running the story that day. Dkt. No. 78-1 at 132. Reitz never spoke with Wilson after learning that the story was to air that day. *Id*. at 137. And there is no summary judgment evidence that Wilson knew when he spoke to Reitz that the story would also air that day. Although a copy of the KTAB news story was not included in the summary judgment record, it appears undisputed that it aired on October 13, 2015, in both televised and on-line versions.

Wilson's characterization of his October 13 phone call with Reitz differs. According to Wilson, he made multiple unsuccessful attempts to contact Reitz between September 9, when he was assigned to the case, and October 13. Wilson claims that he left several voice messages for Reitz but received no response. Dkt. No. 78-1 at 42, 73. Reitz finally called Wilson on October 13 and Wilson requested that he come to the LEC for questioning about the September 4 events. *Id*. at 42. When Reitz declined to do so, Wilson informed him that, if Reitz did not want to cooperate with the investigation then Wilson would file the case with the DA's Office. *Id.* Wilson reported that Reitz told him to contact Reitz's attorney, but did not provide his attorney's name. *Id.*

Wilson recorded his October 13 phone call with Reitz. *See* Dkt. No. 78-1 at 2. After listening to that recording, Wilson believed that Reitz, like the 911 caller, had a distinct New Jersey accent. *Id.* at 42. Wilson then compared the recording of the October 13 call with the recorded 911 calls. *Id*. Wilson found enough similarities to lead him to believe that Reitz made the 911 calls. *Id.* Wilson also requested that the 911 operator who received

the September 4 calls and another detective compare the recordings. *Id*. They told Wilson that they likewise believed the same person made all three calls. *Id.*

Because of the perceived similarities of the voices on the recordings, and because the download of Reitz's cellular data had been inconclusive, Wilson submitted the felony Terroristic Threat case to the DA's Office on October 13, 2015. *Id.* A week later, an Assistant District Attorney requested that the case be re-filed as a Class A misdemeanor False Report, which Wilson did. *Id.* at 14, 42. Wilson received an arrest warrant for Reitz on October 27, 2015, and arrested him at work on October 28, 2015. *Id* at 43.

According to Wilson, he first learned of the KTAB news story shortly after arresting Reitz on October 28 and had not spoken with the news reporter regarding Reitz prior to that arrest. *Id.* at 43. While Wirmel's testimony initially suggests that she had spoken to Wilson before the news story ran (*see* Dkt. No. 96-2 at 11), she later clarified that, prior to October 13 (the date the news story ran), the only person with the APD she had spoken to about the September 4 events was the APD's public information officer, Rick Tomlin. Dkt. No. 78-1 at 94–95. Wirmel did not speak to Wilson until "several weeks after" her interview with Reitz. *Id.* Woods claims that he first learned of the news story after hearing of Reitz's arrest on October 28. *Id.* at 47.

During the events in question, Tatum worked as an Investigator with the Taylor County DA's office (Dkt. No. 101-2 at 18–19) and, as such, was a sworn peace officer in the state of Texas. *See* Tex. Crim. Proc. Code Ann. art. 2.12. He had previous law enforcement experience, including a long tenure with the APD. Dkt. No. 101-2 at 19.

Tatum became involved with Reitz's criminal case only when, on October 26, 2015, he signed the probable cause affidavit prepared by staff in the DA's Office which led to Reitz's October 28 arrest. *Id.* at 24, 27–28. Tatum was not personally involved in the investigation of the September 4 events and had no personal knowledge of whether Reitz made the 911 calls. *Id.* at 30. He did not conduct an independent investigation of the probable cause statements in the affidavit or personally review the 911 calls. *Id.* at 23–25. He did not have any conversations with Woods or Wilson regarding Reitz prior to signing the affidavit. *Id.* at 32, 34. Tatum's singular role in this case was his signing of the probable cause affidavit.

District Attorney James Hicks testified by deposition that Tatum's actions in signing the affidavit were consistent with the practice in the DA's office at the time. *See* Dkt. No. 102-2 at 17–28. Specifically, cases were routinely forwarded to the DA's Office by law enforcement officers seeking a warrant or complaint to be issued. *Id.* at 17. Once the case information is received in the DA's Office, an ADA would review the case information and draft a probable cause affidavit for a complaint or warrant. *Id.* Then, one of the office investigators, like Tatum, would sign the affidavit, thus causing the issuance of a warrant. *Id.* This practice is not materially different than what occurred in this case. *Id.*

The probable cause affidavit signed by Tatum erroneously states in the first paragraph—or "charging" paragraph—that the 911 calls occurred on October 13, 2015, instead of September 4, 2015. Dkt. No. 75 at 3. The correct date appears in the second paragraph—or probable cause paragraph—of the affidavit. *Id.*; Dkt. No. 102-2 at 25.

DA Hicks testified that typographical errors, including errors in dates as in this case, occasionally occur. Dkt. No. 102-2 at 25. He also testified that it is not uncommon for an affidavit to be drafted for one affiant's signature and then retyped for a different affiant if the intended affiant is unavailable, as happened here. *Id*. at 26.

On November 25, 2015, approximately one month after Reitz's arrest on October 28, Wilson and the DA's Office decided to seek an opinion from a local college professor regarding the similarity of the voice recordings before proceeding further with the case. This was done at least in part to avoid incurring the expense of having a private lab analyze the recordings for a misdemeanor case. Dkt. No. 78-1 at 13.

Wilson contacted Dr. Robert Wallace at McMurry University for this purpose. *Id*. Dr. Wallace was the chair of McMurry's Sociology and Criminology Department with no expertise in voice recognition. *Id*.; Dkt. No. 72 at 4. Nevertheless, Wallace concluded there was reasonable doubt that the voices on the recordings were the same person. Dkt. No. 78-1 at 13. He did not express an opinion on whether there was probable cause to arrest or charge Reitz, nor was he asked to do so. Wilson appears to have promptly communicated Wallace's opinion to an ADA who decided the case should be dropped, and the charge against Reitz was then dismissed. *Id*.

## III.  LEGAL STANDARDS

Under Federal Rule of Civil Procedure 56(a), courts "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "As to materiality, the substantive law will

identify which facts are material" and a fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," a dispute over a material fact qualifies as "genuine" within the meaning of Rule 56. *Id.* Because there must be a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48. There is no genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When a party moves for summary judgment on claims on which the opposing parties will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovants' claims." *Armas v. St. Augustine Old Roman Catholic Church*, No. 3:17-CV-2383-D, 2019 WL 2929616, at *2 (N.D. Tex. July 8, 2019) (citing *Celotex Corp.*, 477 U.S. at 325).

In determining whether to grant summary judgment, courts are to view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir.

2016) (citation omitted). If the movant carries that initial burden, the burden shifts to the party opposing the motion to present competent summary judgment evidence showing the existence of a genuine fact dispute. *Matsushita*, 475 U.S. at 586–87; *see also* Fed. R. Civ. P. 56(c). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston, Tex.,* 337 F.3d 539, 541 (5th Cir. 2003) (citations omitted).

When the movant asserts a qualified immunity defense, that assertion "alters the usual summary judgment burden of proof." *Brown v. Callahan,* 623 F.3d 249, 253 (5th Cir. 2010). "Qualified immunity shields government officials from liability when they are acting within their discretionary authority and their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Gates v. Texas Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 418 (5th Cir. 2008) (citations omitted). Movants have no burden "to put forth evidence to meet [their] summary judgment burden for a claim of immunity" and need only assert the defense in good faith. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000).

"[O]nce properly raised by the defendant, the plaintiff has the burden to negate the assertion of qualified immunity." *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016) (citation and internal quotation marks omitted). "A plaintiff seeking to overcome the

defense must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011)). A right is "clearly established" for these purposes only if "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

To defeat a motion for summary judgment based on qualified immunity, "the plaintiff need not present absolute proof, but must offer more than mere allegations." *King*, 821 F.3d at 654 (citation omitted). Furthermore, "[t]he court has no duty no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *see also Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) ("If somewhere in a record there is evidence that might show a dispute of material fact, the district court needs to be pointed to that evidence as opposed to having to engage in an extensive search.").

## IV.  PRELIMINARY MATTERS

Before addressing the motions, the Court addresses some preliminary matters presented by the parties.

### A.  State Law Claims and the Fourteenth Amendment

In his Third Amended Complaint, Reitz suggests that he is suing the three officers for acting negligently and not in a manner to be expected by reasonable law enforcement officers. Dkt. No. 67 ¶¶ 59(a)–(c), 60(a), 61(a)–(c)). He also claims that Wilson and Tatum

were "grossly negligent" in the performance of their law enforcement duties *Id.* ¶¶ 60(a), 61(a)–(c). Yet Reitz also specifically states that he asserts no claims under state law. *Id.* at 2 n.1. And the only federal claims he asserts fall under 42 U.S.C. § 1983, which does not encompass negligence claims. *See Hazelton v. City of Grand Prairie, Tex.*, 8 F. Supp. 2d 570, 579 (N.D. Tex. 1998) (citing *Gonzalez v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 759 (5th Cir. 1993)). Accordingly, the Court finds that Reitz does not assert a negligence, gross negligence, or any other state law claim.

For the reasons stated previously in this case, *see Reitz*, 2017 WL 3046881 at *15–16, the Court also finds that Reitz does not assert any independent claim under the Fourteenth Amendment. Because Reitz merely references that amendment in an incorporation respect, the Court considers the alleged constitutional violations under the more specific rights implicated by the allegations. *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 441 (5th Cir. 2015); *Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994). Thus, Reitz's claims must stand or fall based upon the alleged violations of the First and Fourth Amendments.

**B. Objections to Summary Judgment Evidence**

Among the summary judgment evidence provided by Reitz are three affidavits from his designated expert, Robert Gill, an attorney in private practice with prosecutorial and judicial experience. One affidavit pertains to Woods and Wilson (Dkt. No. 96-2), another pertains to Tatum (Dkt. No. 101-2), and the third pertains to Taylor County (Dkt. No. 102-2). Woods and Wilson object to the opinions expressed in Gill's affidavits on grounds of

reliability and relevance. Dkt. Nos. 97 at 2, 98 at 5. Taylor County makes similar objections.[7] Dkt. No. 105 at 2.

The Court previously addressed Defendants' joint motion to strike Reitz's designated expert witnesses, including Gill, under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Dkt. No. 88. The Court denied that motion without prejudice, but noted that "the admissibility of proffered expert opinions will likely arise again in this case" and that the Defendants could assert objections to specific expert opinions insofar as Reitz relies on them in a dispositive motion, which he has now done. *Id*. at 15.

Woods and Wilson argue that Gill's opinions are unreliable because they: (1) are not based on facts in evidence; (2) are based on unsubstantiated and/or conclusory mischaracterizations of the facts; (3) fail to identify any reasonable alternatives; (4) show no logical connections to any scholarly work or empirical data; and (5) are based solely on Gill's self-described review of "some information" from the pleadings and depositions. Dkt. No. 98 at 5. Woods and Wilson provide specific examples for why they believe that Gill's expert opinions are lacking in reliability.[8]

---

[7] Although Tatum did not file objections to Gill's affidavit, the Court may addresss concerns regarding that affidavit sua sponte. *See Graham v. Dallas Area Rapid Transit*, 288 F. Supp. 3d 711, 729 n.9 (N.D. Tex. 2017) ("As numerous courts have recognized, while no party has raised any *Daubert* challenges, the court has authority to raise its concerns sua sponte to fulfill its unique gatekeeping function and ensure the integrity of the judicial process.") (citations omitted).

[8] *See generally* Dkt. No. 98 at 7–9. For example, Woods and Wilson point out that Gill claims Woods was "threatening" and "really mad" during a phone conversation with Reitz despite there being no recording of that call. *Id*. at 8. Gill further states that "Woods did not want Reitz telling a reporter about what had happened to Reitz. This was very scary to Reitz." Dkt. No. 96-2 at 65. Defendants point to other examples of unsupported factual statements

In arguing that Gill's opinions are also lacking in relevance, Woods and Wilson claim that Gill's affidavit: (1) "is replete with legal conclusions that attempt to circumvent the judge's authority and instruct the judge or jury as to what legal conclusions it should find"; (2) is so conclusory that it fails to raise a genuine issue of fact; (3) "nearly perfectly resembles, and contains the same naked conclusions and unsubstantiated allegations as, all [Reitz]'s multiple Petitions"; (4) "merely restates facts which could be understood by any layperson"; and (5) "mischaracterizes [] facts and develops unfounded factual conclusions to fit into his narrative." *Id*. at 6–7, 10–11.

Similarly, Taylor County argues that Gill's affidavit is not competent summary judgment evidence because Gill's opinions are conclusory, unreliable, and not based on sufficient facts or data. Dkt. No. 105 at 9–10. Taylor County further argues that Gill's affidavit is simply a third-party legal opinion, in which Gill is "playing both judge and jury." *Id*. at 10.

Reitz has not responded to any of the Defendants' objections to Gill's opinions.

"The admissibility of expert testimony is governed by the same rules, whether at trial or on summary judgment." *First United Fin. Corp. v. U.S. Fid. & Guar. Co.,* 96 F.3d 135, 136–37 (5th Cir. 1996). Trial courts have authority under Federal Rule of Evidence 702[9] and *Daubert* to ensure that expert testimony is both relevant and reliable. *See Kumho*

---

in Gill's affidavit. *Id*. The Court also notes that one of Gill's statements is nearly identical to a statement included in Reitz's affidavit, where Reitz states that "Woods did not want me telling a reporter about what had happened to me. This was very scary to me." Dkt. No. 96-2 at 78.

[9] Rule 702 provides:

*Tire Co. v. Carmichael*, 526 U.S. 137, 149–52 (1999). Trial courts also "ensure the reliability and relevance of expert testimony" by applying Rule 703.[10] *See In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012).

In determining reliability, a trial court must find that an expert opinion has "a reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co.,* 526 U.S. at 148. The Supreme Court provided several factors in *Daubert* that trial courts can consider, but a trial court has "the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id*. at 141–42. And a court's rulings on the admissibility of expert opinion evidence "must be sustained unless manifestly erroneous." *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir. 1987). Ultimately, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" and decide not to admit opinion evidence.

---

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

[10] Rule 703 provides:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

*Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997).

The party seeking to use expert opinion testimony has the burden to show that the opinion is reliable. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). However, a trial judge may not exclude an expert opinion "on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702, Advisory Comm. Note, 2000 Amend. Nevertheless, "[i]n considering a Rule 56(c) motion opposed by expert testimony, the trial court has broad discretion to rule on the admissibility of the expert's evidence . . . ." *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir. 1988). "If the basis for an expert's opinion is clearly unreliable, the district court may disregard that opinion in deciding whether a party has created a genuine issue of material fact." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000); *see also Daubert*, 509 U.S. at 596 ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free . . . to grant summary judgment.").

In evaluating an expert opinion's relevance, the court must determine whether the opinion aids the trier of fact in resolving a *factual* dispute given its connection to the facts of the case. *See id.* at 591. A court may admit a range of opinions as relevant and "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Nevertheless, expert witnesses are not permitted to offer opinions as to "*legal* conclusions." *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). Allowing "an expert to give his opinion on the legal conclusions to be drawn from the evidence both

invades the court's province and is irrelevant." *Id.*

Gill's three affidavits, ranging from eighteen to twenty-five pages, contain substantial overlap and redundancy as he offers observations and opinions on a wide array of topics, some of which are at best tangentially related to his experience.[11] But ultimately, Gill's opinions can be distilled down to his conclusions that (1) there was no probable cause for Reitz's arrests and charging (Woods and Wilson), (2) the information relied upon by Tatum in executing the probable cause affidavit was insufficient and thus he lacked sufficient knowledge of probable cause (Tatum and the County), (3) Woods and Wilson violated Reitz's First Amendment rights (Woods and Wilson), (4) the County had a policy, practice, or custom of permitting probable cause affidavits to be executed by affiants who lacked sufficient knowledge of probable cause, and (5) the County ratified Tatum's actions for purposes of establishing *Monell* liability (the County). Each of these opinions suffers from similar defects, as discussed below.

Prefacing Gill's opinions is a primer on several principles of law, ranging from protections afforded under the First and Fourth Amendments, *see* Dkt. Nos. 96-2, 101-2, 102-2 ¶¶ 20–22, to Gill's definition of probable cause.[12] This purported legal instruction is

---

[11] For example, Gill states that he has "learned, through experience with actual cases, that sometimes devious persons, either individually or in groups, may mislead others, and may even 'set up' or 'frame' innocent persons." Dkt. Nos. 96-2, 101-2, 102-2 ¶10.

[12] Gill states that "[a]t a minimum probable cause . . . requires that an *actual* crime be committed at an *actual* date and time and place . . . ." Dkt. Nos. 96-2, 101-2, 102-2 ¶14 (italics added). This formulation suggests that if there is sufficient evidence to convince a reasonable person that a suspect has committed a crime and an officer arrests or charges that person, a subsequent determination that no crime *actually* occurred deprives the earlier arrest or charge of probable cause. That is simply not the case, and the Court assumes this is an inadvertent misstatement by Gill of what probable cause requires.

accompanied by self-evident observations from Gill, including that those in law enforcement should not deprive persons of their constitutional rights (*see* Dkt. No. 96-2 ¶ 22),[13] that some criminal cases "should not be prosecuted . . . or reach a point at which they should be dismissed" (*see* Dkt. Nos. 96-2, 101-2, 102-2 ¶ 12), and that "false affidavits are illegal, and that no person should swear falsely to an affidavit." (*see* Dkt. Nos. 96-2, 101-2, 102-2 ¶ 11).

Gill then purports to connect his statements of the law and observations to his opinions by largely parroting, often verbatim, large sections of both factual allegations and advocacy from Reitz's filings in what appears to be an attempt to give Reitz's theories and version of facts the heft or imprimatur of expert opinion.[14] In so doing, Gill not only purports to provide the Court with the law, but also applies the law to the facts in order to supply the Court with ultimate legal conclusions. *See United States v. Muniz-Melchor*, 894 F.2d 1430, 1439 n.9 (5th Cir. 1990) (noting that whether an officer has probable cause is a mixed question of law and fact, but the ultimate determination is a question of law). In other words, none of Gill's opinions move the needle on whether there is a genuine issue of material fact in this case.

Even if the Court assumes that Gill's opinions that Taylor County engaged in or ratified a policy, practice, or custom of violating persons' federally protected rights goes

---

[13] For example, Gill states that "[n]o competent police officer or detective would try to deny these rights to any citizen." (Dkt. No. 96-2 ¶ 22). And Gill states that "[n]o competent investigator in any prosecutor office [or in any district attorney office or in any police department] and no competent police officer or detective would try to deny these rights to any citizen." (Dkt. No. 101-2 ¶ 22).

[14] Several examples of this can be seen in paragraphs 26–33 of Gill's affidavit. Dkt. No. 96-2 at 63–67.

to a question of fact, those opinions presuppose and subsume Gill's legal conclusion that what Tatum did in executing the affidavit was improper, which the Court finds below was not.[15]

Moreover, in providing the Court with his ultimate legal conclusions, Gill not only assumes Reitz's facts as true, but he fails to consider or even acknowledge facts that are not favorable to Reitz, but which are highly relevant to both the opinions Gill offers and whether genuine issues of material fact exist here. For instance, in one opinion, Gill concludes that

> What officer Woods did to Reitz, as detailed hereinabove, was unreasonable, incompetent, and unprofessional, to such an extent that no competent officer would have done it, and no reasonable officer would have or should have done it. The detention of Reitz by Woods amounted to a wrongful arrest, and was without probable cause. Clearly Woods had no probable cause to detain Reitz as he did.

Dkt. No. 96-2 at 68, ¶ 37. The only facts provided in support of this opinion are taken, again largely verbatim and *in toto*, from Reitz's filings. And other facts that should have been considered in reaching this opinion, particularly undisputed as they are, are not mentioned at all. Specifically, although Gill purports to assess the reasonableness of Woods's conduct in detaining Reitz, absent from his opinion on that issue is a consideration of the particular facts known to Woods at the time of that detention. Such facts include the discovery by officers of the Sig Sauer pellet gun, Reitz's contentious break-up with his girlfriend after reporting her to the police, and the reports by neighbors that Reitz exhibited

---

[15] And for reasons explained below, because the Court ultimately finds that Tatum did not commit a constitutional violation, any opinion regarding whether his employer, Taylor County, had a policy, practice, or custom, that was the moving force for such a violation are ultimately irrelevant to the disposition of the claims against the County.

strange behavior.

The overall conclusory nature of Gill's opinions results in numerous similar "analytical gaps" between the facts in the record, even undisputed ones, and the opinions proffered, *see Joiner*, 522 U.S. at 146, and, in at least one instance, appears to result from a strained representation of the record.[16]

There are also several examples of conclusions or opinions by Gill which either assert as true inherently unverifiable statements (including statements about the mental states of the parties in the case),[17] fail to demonstrate a basis or analysis,[18] fail to consider alternative explanations,[19] or fail to demonstrate Gill's expertise for the opinion offered.[20]

---

[16] Gill summarily concludes that "Woods is an incompetent police officer." *See* Dkt. No. 96-2 ¶ 23. This jarring conclusion is based solely on Woods's deposition testimony that police officers are not always required to obey the law in the same way as private persons. *Id*. At best, this admission lacks context, absent both from Gill's analysis and elsewhere in the record. The Court can readily conceive of instances when police officers are not required to obey the law in the same way as private persons. To the extent Reitz or Gill invite this Court to infer from this isolated testimony that Woods believes he has carte blanche to violate persons' constitutional rights, the Court declines that invitation.

[17] *See, e.g.,* Dkt. No. 96-2 ¶ 26 ("[]Mr. Reitz, does not know who made the subject 911 call on 4 September 2018."); *id*. ¶ 28 ("On or about 4 September 2015 defendant officer Woods knew that Plaintiff Reitz has not made the subject '911' call, and knew that Plaintiff Reitz had not committed any crime."); *id*. ¶ 32 ("This was frightening to Reitz even though Reitz knew then that in fact he had never committed a crime."); Dkt. Nos. 101-2, 102-2 ¶ 36 ("[Tatum] knew when he signed the false affidavit that it contained false statements.").

[18] For example, Gill's conclusion that Reitz was intentionally charged with a "fabricated crime" is based solely on the inclusion of an incorrect date in the probable cause affidavit. *See, e.g,* Dkt. Nos. 101-2, 102-2 ¶¶ 31–34. Simply extrapolating from the inclusion of an incorrect date to the conclusion that Reitz was being framed or intentionally charged with a fabricated crime is too great of an analytical leap. And even assuming retaliatory animus on the parts of Defendants fails to explain the inclusion of an incorrect date, particularly when accompanied by the correct one.

[19] For example, Gill fails to consider the possibility that the inclusion of October 13 was an unintentional error and, if so, why such an error should vitiate the warrant. Gill's opinion that the error in the date was material is undercut by the discovery that Gill's affidavit, sworn to under oath just like Tatum's, incorrectly refers four times in each affidavit to September 4, 2015, as "4 September *2018*." Dkt. Nos. 96-2, 101-2, 102-2 ¶¶ 24, 25, 26, 27 (emphasis added). Clearly, inadvertent errors in important affidavits do unfortunately occur, but in isolation rarely justify a presumption of nefarious intent.

[20] For example, Gill provides an opinion on the operation of police department 911 call centers and the tracking of 911 calls without considering the actual capabilities of the APD call center and despite no evidence that Gill has ever worked in or otherwise acquired expertise in such operations. *See* Dkt. Nos. 96-2, 101-2, 102-2 ¶ 24. And Gill provides

In short, Gill's opinions suffer from numerous flaws in both methodology and substance.

Ultimately, the Court stops short of finding that Gill's opinions are unreliable at the summary judgment stage because it is sufficient here to find, as the Court does, that Gill's opinions invade the province of the Court and thus are mainly irrelevant. Reitz does not offer Gill for purposes of establishing a genuine issue of material fact. He offers Gill as a judge to supply both the law and the ultimate legal conclusions Reitz seeks. Because each of Gill's opinions encroaches on issues which are reserved to the Court, the Court exercises its discretion to exclude those opinions from the Court's consideration of the summary judgment evidence. *See Munoz*, 200 F.3d at 302.

## V. ANALYSIS

### A. Officer Woods

Reitz sues Woods under the Fourth Amendment for detaining and arresting him on September 4, 2015, and under the First Amendment for his actions in allegedly trying to suppress the KTAB news story. Dkt. No. 67 at 88 ¶ 59(a)–(c). Woods has carried his initial summary judgment burden through his good-faith invocation of the qualified immunity defense.[21] Reitz now has the burden to present competent summary judgment evidence to

---

opinions regarding Reitz's pecuniary losses, mental anguish, and other damages allegedly caused by the Defendants. *See* Dkt. Nos. 96-2, 101-2, 102-2 ¶¶ 34–36.

[21] Wilson and Woods previously filed a motion to dismiss asserting qualified immunity. The Court denied Woods and Wilson's prior motion applying the standards applicable for motions filed under Fed. R. Civ. P. 12(b). *See Reitz*, 2017 WL 3046881 at *17–18 (Fourth Amendment claim regarding providing false or incorrect information), 19–21 (Fourth Amendment claim regarding seizure and arrest), 22–23 (First Amendment claim). Nevertheless, owing to the different standards between Rule 12(b) and Rule 56, the Court's prior rulings on the former motion is not dispositive of the latter motion now before the Court.

show the inapplicability of the defense. *King*, 821 F.3d at 654. Reitz's counsel conceded during the summary judgment hearing that, as among the defendants, the evidence that Woods violated Reitz's rights was the "thinnest." The Court agrees.

1. Fourth Amendment Claim

Reitz argues that his detention by Woods on September 4 amounted to an arrest without probable cause. Dkt. No. 96 at 4 n.6. Reitz further argues that Woods is not entitled to qualified immunity because Woods acted unreasonably in denying Reitz his rights. *Id*. at 3–4.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When a government actor restrains the liberty of a citizen "by means of physical force or show of authority," such restraint qualifies as a seizure which triggers Fourth Amendment protections. *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). A "person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Carroll v. Ellington*, 800 F.3d 154, 170 (5th Cir. 2015) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Both traditional arrests and lesser restraints on physical freedom may qualify as seizures under the Fourth Amendment. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735–36 (arrest); *Peterson v. City of Fort Worth*, 588 F.3d 838, 845 (5th Cir. 2009) (detention). For

summary judgment purposes, the Court accepts that Woods's detention of Reitz on September 4 triggered Fourth Amendment protections. *See Bailey v. United States*, 568 U.S. 186, 192–93 (2013); *al-Kidd*, 563 U.S. at 735–36; *Graham*, 490 U.S. at 395 n.10; *Peterson*, 588 F.3d at 845.

"Warrantless seizures of a person inside his home are 'presumptively unreasonable.'" *United States v. Watson*, 273 F.3d 599, 602 (5th Cir. 2001) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)). "Only exigent circumstances or consent justify such an arrest." *Id.* But regardless of the arrest location, "a warrantless arrest must be supported by probable cause." *Sam v. Richard*, 887 F.3d 710, 715 (5th Cir. 2018) (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).

Here, there is no dispute that the APD police officers on September 4 were faced with exigent circumstances that justified the warrantless entry into Reitz's apartment and his warrantless initial detention. Reitz's counsel conceded this fact at the summary judgment hearing. The question is whether, after those exigent circumstances passed and no injured hostage was found, Woods's continued detention of Reitz was unreasonable given the facts and circumstances known to Woods at that time.

After the SWAT team entered Reitz's apartment on September 4, officers other than Woods handcuffed Reitz and eventually placed him in Woods's police vehicle. Although Woods soon learned that no shooting victim was found inside Reitz's apartment and that Reitz was not armed as described in the 911 calls, a criminal investigation nevertheless remained ongoing. And as primary officer on the scene, Woods was charged with gathering

information and drafting a report of the incident.

Woods only encountered Reitz when Woods returned to his police vehicle and found Reitz handcuffed in the back seat. At that point, Woods took no steps to release Reitz. Thus, Reitz's liberty remained restrained by Woods's show of authority.

"The constitutional claim of false arrest requires a showing of no probable cause." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009). "Probable cause exists where the facts and circumstances within [an officer's] knowledge and of which [he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (citation and internal quotation marks omitted). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). The arresting officer must have "more than a 'bare suspicion' but less than a preponderance of evidence" that the person arrested had committed an offense. *Watson*, 273 F.3d at 602.

There is no dispute that an unidentified male called 911 and reported that he had shot his girlfriend, whom he claimed to be holding hostage in his apartment. The caller demanded to speak with a hostage negotiator and threatened to shoot any responding police officers. It is also undisputed that the caller provided Reitz's specific address and that Reitz was the only person at that address. While officers did not encounter an armed man holding an injured hostage, they did find an individual who may have made false 911 calls.

Other than Reitz, Woods had no other suspect who might have made the calls.[22] Woods learned through his investigation at the apartment complex on September 4 that Reitz had just returned from his weekly appointment with a psychiatrist. Woods learned that neighbors, one of whom was a mental health professional, had observed Reitz acting strangely. Woods learned that Reitz previously had a girlfriend who had been seen coming and going from Reitz's apartment. And he also learned that this relationship ended under contentious circumstances which included Reitz filing a police report for theft against her. Based on these undisputed facts as known by Woods on September 4, Woods believed he had probable cause to suspect Reitz of making false 911 calls. And there can be no legitimate dispute that Woods's decision to further investigate Reitz that day for making the 911 calls was a reasonable one.

Because Woods's initial examination of Reitz's phone at the scene provided no conclusive information, he decided to continue the investigation at the LEC with Reitz still in custody. Once there, Reitz signed a release, consenting to a search of his phone. When that search reached a dead end due to the incomplete download of the phone's data, and Woods found himself with no conclusive evidence tying Reitz to the 911 calls, Woods ended the detention and returned Reitz to his apartment.

Woods's investigation at the apartment complex on September 4 produced reasonably trustworthy evidence that Reitz had fairly recently ended a relationship with a

---

[22] Despite argument from Reitz's counsel at the summary judgment hearing that he found it strange that the APD could not trace the blocked 911 calls and easily identify the 911 caller, a view shared by Gill, here there is no summary judgment evidence that the APD had the ability to trace blocked 911 calls.

girlfriend on contentious terms that included his calls to the police and that he had a history of reportedly strange behavior. [23] He also lived at the address given by the 911 caller and was in possession of a Sig Sauer pellet gun. Even viewing these facts in a light most favorable to Reitz, the totality circumstances known to Woods at the time were sufficient to cause a person of reasonable caution to believe that an offense had been committed and that Reitz may have committed it. This renders Woods's continued detention of Reitz on September 4 reasonable, *see Safford*, 557 U.S. at 370, and prevents Reitz from overcoming Woods's assertion of qualified immunity. Reitz has not shown that Woods "could not have reasonably believed that [he] had probable cause to arrest the plaintiff for any crime." *See Good v. Curtis*, 601 F.3d 393, 401 (5th Cir. 2010).

"As applied to the qualified immunity inquiry, the plaintiff must show that the officers could not have reasonably believed that they had probable cause to arrest the plaintiff for any crime." *Good*, 601 F.3d at 401 (citations omitted). With respect to an alleged false arrest, an officer "is entitled to qualified immunity if a reasonable officer in his position could have believed that, in light of the totality of the facts and circumstances of which [the officer] was aware, there was a fair probability that [the suspect] had committed or was committing an offense." *Haggerty v. Texas S. Univ.*, 391 F.3d 653, 656 (5th Cir. 2004). "Even law enforcement officials who reasonably, but mistakenly, conclude that probable cause is present are entitled to immunity." *Gibson v. Rich*, 44 F.3d 274, 277

---

[23] It was suggested during the summary judgment hearing that Reitz had the APD non-emergency number saved in his phone due to prior police service calls related to his reporting his girlfriend to the police.

(5th Cir. 1995) (citing *Anderson*, 483 U.S. at 641); *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994).

Woods continued to restrain Reitz's liberty until he determined that there was insufficient evidence to reasonably conclude that Reitz's phone had been used to call 911. While it is unclear how long Reitz's liberty was restrained on September 4, the summary judgment record suggests it was only a matter of a couple of hours, at most.

Tellingly, during the summary judgment hearing, Reitz's counsel was unable to identify for the Court the point during Reitz's detention when Woods was constitutionally required to remove Reitz's restraints or when that detention became unlawful. If this decision remains unclear and continues to elude precise determination with the benefit of over five years' hindsight and extensive discovery among the parties, it would have been even more difficult for Woods on September 4, 2015.

The Court finds that Reitz has failed to overcome Woods's assertion of qualified immunity against the Fourth Amendment claim for unlawful detention or arrest against Woods, and thereby failed to carry his summary judgment burden on that claim. Reitz did not have a constitutional right not to be detained by Woods under the particular circumstances presented on this record, nor do any of the facts Reitz claims are disputed change this result. For these reasons, the Court grants Woods's motion for summary judgment as to Reitz's Fourth Amendment claim against him.

2. First Amendment Claim

Reitz premises his First Amendment claim against Woods on alleged attempts to

intimate Reitz to curtail communications with the KTAB news reporter, to "kill" the KTAB news story, and to cover up police misconduct. *See* Dkt. No. 67 ¶ 59(a)–(c).

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). To establish a retaliation claim under the First Amendment in cases brought by "ordinary citizens,"[24] plaintiffs "must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." *Id.*

An officer is entitled to qualified immunity on First Amendment claims "[i]f the officer's conduct was objectively reasonable in the light of clearly established federal law." *Id.* at 261 (discussing qualified immunity in case where plaintiff alleged retaliation from officer for speaking out against corruption in a constable's office). At the same time, there is a presumption that "government retaliation against a private citizen for exercise of First Amendment rights cannot be objectively reasonable." *Id.*

This presumption can be overcome in cases where "law enforcement officers might have a motive to retaliate but there was also a ground to charge criminal conduct against

---

[24] "Ordinary citizens" are individuals with "with no employment-related ties to the government." *Kinney v. Weaver*, 367 F.3d 337, 358 (5th Cir. 2004). Unlike in "government employee" cases, "the government has no legitimate interest in denying a benefit to 'ordinary citizens' on account of their speech on matters of public concern" and "there is no interest balancing involved in the First Amendment analysis." *Id.*

the citizen they disliked." *Id*. In such instances "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." *Id*. at 261–62. Thus, the reasonableness inquiry centers on whether probable cause existed for the officer's actions.

> If no reasonable police officer could have believed that probable cause existed for the law enforcement actions of [the police officers] against the plaintiffs, then their retaliation violated clearly established law in this circuit. If probable cause existed, however, or if reasonable police officers could believe probable cause existed, they are exonerated.

*Id.* at 262 (internal citations omitted).

Woods claims entitlement to qualified immunity on the First Amendment retaliation claim because he had probable cause to detain or arrest Reitz. Dkt. No. 77 at 23. Woods further argues that Reitz was not injured by the alleged retaliation because he cannot demonstrate how his speech was curtailed by Woods's actions. *Id*. He notes that Reitz still spoke to the media after his last conversations with both Woods and Wilson. *Id*. at 23–24.

Reitz fails to meaningfully respond to these arguments. *See* Dkt. No. 96-1 at 26–27. Reitz also fails to provide the Court with responsive authority and instead directs the Court's attention to inapplicable case law centered on the identity of policymakers in First Amendment municipal liability cases. *Id*. at 26. Otherwise, Reitz makes general statements about the importance of free speech and the freedom of the press. *Id*. And for reasons noted earlier, the legal conclusions submitted by Reitz's expert, Gill, on this point are irrelevant.

As a threshold matter, Reitz has failed to present competent summary judgment evidence showing that a First Amendment violation even occurred. Reitz alleges that the KTAB news report "embarrassed and angered Defendants, especially Defendants Woods

and Wilson." Dkt. No. 67 at 33. Reitz further alleges that "[t]he Abilene police did not like this KTAB news report." *Id*. at 47.

No copy of the purportedly embarrassing story that appeared both on television and online is included in the summary judgment record. Instead, Reitz provides second-hand excerpts from the news story. These excerpts include his own reported statement that "[i]t's not right for someone to come busting into your house, throw you in cuffs and take you down to the station for something you didn't do[,]" as well as Wirmel's reporting that "detectives from the Abilene Police Department had indicated that Plaintiff Reitz was 'cleared,' and that there was 'no evidence' to link him to misconduct." *Id*. Reitz further notes that the news story stated the following: "'APD says there is no arrest report for Reitz . . . .' and that the reporter had been told by APD that Plaintiff was in fact taken into 'custody for questioning by detectives.'" *Id*. Reitz does not appear to explain how any of these statements, or the contents of the news story generally, reflected badly on Woods, Wilson, or the APD such that they were "embarrassed and angered" or would otherwise want to kill the story.

In her deposition testimony, Wirmel read a paragraph from the report, stating that: "Reitz would eventually be cleared. APD detectives say there was no evidence to link him to the actual 9-1-1 call. Now Reitz says all he wants is justice." Dkt. No. 96-2 at 11. Wirmel also verified that the title of the news story was "False 911 Call Leads to Mistaken Arrest." *Id*. at 12.

Construing the facts in Reitz's favor, he has not demonstrated that Woods retaliated

against him in violation of his First Amendment rights. Here, other than Reitz's subjective speculation and strained inferences, there is no evidence the officers or anyone with the APD were upset by the report, contacted the reporter in an attempt to influence the story, attempted to exploit their contacts at KTAB to kill the story, or otherwise did anything to prevent the story from airing or change its content. *See* Dkt. 96-2 at 78. And Reitz's speculation, standing alone, is insufficient to create a genuine issue of material fact on his First Amendment claim.

As set out in his own affidavit, Reitz first met the news reporter two weeks after the September 4 events and his detention by Woods. On the day that Reitz met the reporter, Reitz claims that he made an unsuccessful attempt to speak to Woods at the police station. After allegedly being avoided by Woods, Reitz called Woods, and left a message requesting that he call him back, a call that Woods returned that same day. It was only during Woods's return call, made at Reitz's request, that Reitz inferred Woods's anger about the news story. Reitz made this inference because, according to Reitz, Woods repeatedly emphasized to Reitz that he had not seen Woods at the police station. But the Court does not view that as a reasonable inference from the summary judgment record here. And Reitz has failed to provide a reasonable basis to support drawing that inference regarding Woods's intentions. Furthermore, according to Reitz's affidavit, Wilson, not Woods, wanted Reitz to "kill" the news story. *See id.* at 78–79.

Apart from Woods being allegedly "abrasive" during a phone call initiated at Reitz's request, it is unclear what Reitz considers to be the adverse actions Woods took against

him in retaliation for speaking to the press. Woods's initial decision to detain Reitz occurred two weeks prior to Reitz ever meeting the KTAB reporter. And Woods's role in the investigation had ended by the time Reitz met the reporter.

Reitz also fails to present competent summary judgment evidence showing he endured injury from the purported violation of his First Amendment rights. The injury requirement derives from § 1983's status as a tort statute, but the injury "need not be great in order to be actionable." *Keenan*, 290 F.3d at 259 (citing *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). To establish actual injury "a retaliation claim requires some showing that the plaintiff['s] exercise of free speech has been curtailed." *Id.* at 259 (citations omitted). But the "required showing of actual injury does not necessarily mean that plaintiffs must cease criticizing the government officials altogether in order to have a claim for retaliation." *Id.* at 260.

Even applying the relatively low bar for an actionable First Amendment injury, Reitz has failed to demonstrate a genuine issue of material fact regarding whether his speech was curtailed by Woods's actions. In his Third Amended Complaint and response to the motion for summary judgment, Reitz admits that he continued to speak to the news reporter even after he was made aware of Woods's purported desire that he not do so. Reitz alleges only that the actions of Woods made him "scared." But from the excerpts from the news story that appear in the summary judgment record, Reitz apparently felt free not only to speak to the reporter, but to speak frankly and express views critical of the police.

As noted above, the law does not require a complete cessation of a plaintiff's

exercise of free speech for the plaintiff to be injured by retaliatory actions of law enforcement. But Reitz fails to explain how his subjective fear resulting from Woods's alleged abrasiveness during a single phone call that took place after Woods's involvement in the investigation ceased curtailed Reitz's communications with the press even slightly.

Viewing the facts in the light most favorable to Reitz reveals no adverse action by Woods that was substantially motivated by Reitz exercising his First Amendment rights. Nor has Reitz overcome Woods's qualified immunity as to this claim.

For these reasons, the Court grants Woods's motion for summary judgment as to the First Amendment claim.

## B. Detective Wilson

Reitz sues Detective Wilson under the Fourth Amendment for "framing" him and then falsely arresting him on October 28, 2015. Dkt. No. 67 ¶ 60(a)–(c). Reitz also sues Wilson under the First Amendment for retaliating against him for cooperating with the KTAB reporter and to cover up police misconduct. *Id*.

### 1. Fourth Amendment Claim

Unlike the detention by Woods on September 4, Wilson's October 28 arrest was made pursuant to a warrant, the issuance of which necessarily required a probable cause determination. As is the case with warrantless arrests, a claim for false arrest made pursuant to a warrant "requires a showing of no probable cause." *See Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir.), *cert. denied*, 140 S. Ct. 220, 205 (2019) (citing *Club Retro,* 568 F.3d 181 at 204).

In most cases, under the independent intermediary doctrine, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Arizmendi*, 919 F.3d at 897. However, "[d]espite review by an independent intermediary, the initiating party may be liable for false arrest if the plaintiff shows that 'the deliberations of that intermediary were in some way tainted by the actions of the defendant.'" *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (quoting *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)). One such circumstance giving rise to taint is where an officer intentionally or recklessly includes false statements in a warrant application. *See Arizmendi*, 919 F.3d at 897.

Under *Franks v. Delaware*, 438 U.S. 154 (1978), "even if an independent magistrate approves a warrant application, 'a defendant's Fourth Amendment rights are violated if (1) the affiant, in support of the warrant, includes a false statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) the allegedly false statement is necessary to the finding of probable cause." *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018) (quoting *Franks*, 438 U.S. at 155–56). "Likewise, the intentional or reckless *omission* of material facts from a warrant application may amount to a Fourth Amendment violation." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (emphasis added) (citation omitted).

Qualified immunity does not protect "officers who maliciously or reckless[ly] represent or omit material information" to procure an arrest warrant or indictment. *Kugle*

*v. Shields*, 62 F.3d 395 (Table), No. 93-5567, 1995 WL 450219, at *4 (5th Cir. July 7, 1995) (first citing *Hale v. Fish*, 899 F.2d 390, 399 (5th Cir. 1990); then citing *Hand*, 838 F.2d at 1428). "If the facts omitted from an affidavit are 'clearly critical' to a finding of probable cause, then recklessness may be inferred from the proof of the omission itself." *Hale*, 899 F.2d at 400 (citation omitted).

But negligent conduct leading up to the issuance of a warrant is not actionable. *See Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir. 1989) (holding that plaintiff's arrest resulting from police negligence in including the wrong first name of the suspect on materials submitted for indictment and warrant was not actionable).

"[A] deliberate or reckless misstatement may form the basis for a *Franks* claim against a government official who is not the affiant." *Hart v. O'Brien*, 127 F.3d 424, 448 (5th Cir. 1997), *abrogation on other grounds recognized by Spivey v. Robertson*, 197 F.3d 772, 775–76 (5th Cir. 1999). Government officials cannot "insulate one officer's deliberate misstatements merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks*, 438 U.S. at 163 n.6; *accord Melton v. Phillips*, 875 F.3d 256, 262 (5th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 1550 (2018). Nevertheless, "an officer must have assisted in the preparation of, or otherwise presented or signed a warrant application in order to be subject to liability under *Franks*." *Melton*, 875 F.3d at 263 (finding that deputy who had prepared original incident report was not liable under *Franks* because there was no indication that the officer prepared the report for use in the complaint).

Here, Wilson was the lead detective on Reitz's case. In that role, he reviewed the

original incident reports, investigated the facts and circumstances surrounding the 911 calls, and prepared his own reports documenting his findings. Upon determining that there was enough evidence to charge Reitz with a crime, Wilson submitted the case to the DA's office. There, the case file was reviewed and the reports provided by Wilson and other officers were used to draft the probable cause affidavit on which Reitz's arrest warrant was issued. Tatum, not Wilson, signed the probable cause affidavit. But after issuance of the warrant, Wilson executed the warrant and ultimately arrested Reitz on October 28.

Not being the affiant, Wilson's potential Fourth Amendment liability under *Franks* is limited. After Wilson submitted the case to the DA's office, the file was reviewed by at least one ADA in advance of an ADA drafting the probable cause affidavit, and that affidavit was reviewed and signed by another law enforcement officer— here, Tatum. And there is no summary judgment evidence that Wilson communicated with Tatum, or otherwise sponsored a misstatement of material fact, prior to Tatum's signing the affidavit. Wilson's role in applying for the warrant, therefore, was sufficiently attenuated that he is arguably entitled to qualified immunity solely based on that attenuation. *See Melton*, 875 F.3d at 266 (noting that the plaintiff bears the burden of showing that officer "prepared, presented, signed, or provided information for use in the complaint" as defined under clearly established law). Nevertheless, the Court will assume that Wilson was closely enough involved that he "assisted in the preparation of" Reitz's warrant application for the purposes of analyzing *Franks* liability at the summary judgment stage.

Under the first prong of *Franks*, Reitz must present evidence that Wilson, through

material misstatements or omissions, made "a false statement knowingly and intentionally, or with reckless disregard for the truth" for the purpose of inclusion in the warrant application. *See Winfrey*, 901 F.3d at 494. But outside of conclusory allegations that he was "framed" by Wilson, Reitz does not direct the Court to any statement by Wilson that was false or misleading, much less one that was material to the probable cause determination supporting the issuance of the warrant.

Statements from Wilson's report included in the probable cause affidavit are brief but significant. The affidavit contains the statement that "[i]t was reported by Detective Wilson that he reviewed the 911 calls and also spoke with Mr. Reitz. It appeared to Detective John Wilson that the 911 calls were made by Mr. Reitz." Dkt. No. 78-1 at 38.

This statement regarding Wilson's impressions about the identity of the 911 caller is taken directly from Wilson's investigation report dated October 2, 2015. *See id*. at 11. Wilson's original statement was phrased as his subjective impression, not an incontrovertible fact. Wilson stated in his report that "[i]t appears that the recorded calls are from the same person." *Id*. Wilson did not state definitively that Reitz and the 911 caller were the same person. And immediately after stating his opinion that the voices appeared to be the same, Wilson added additional qualifiers, flagging for any subsequent readers— presumably including the ADA who would be responsible for assessing whether probable cause existed and, if so, drafting the affidavit—that the issue upon which he opined is disputed and that the physical evidence upon which his assessment was based is contained in the file. Specifically, Wilson stated that "[t]he 911 calls and the call I did make to the

suspect were recorded and booked into evidence. It should be noted that the suspect in this case stated that he did not make the calls, and told me he was going to refer all calls to his attorney. When asked who his attorney is, the phone line disconnected." *Id.*

Reitz has failed to bring forth any evidence that the recorded voices were dissimilar or, more importantly, that the voices did not actually appear similar to Wilson. According to uncontradicted evidence in the summary judgment record, Wilson had the calls reviewed by at least two other people: the 911 operator who had received the calls and another police detective. Both the 911 operator and detective reportedly agreed with Wilson's assessment of the similarity of the voices, and Reitz has not challenged those assessments.

Even if the Court assumes that Wilson's opinion regarding the similarity of the voices was incorrect, there is no summary judgment evidence that Wilson intentionally or recklessly misrepresented the similarity. Under these circumstances, it would have been reasonable for Wilson to assume the ADA would independently determine whether there was probable cause based on the ADA's review of the file, including the evidence booked into the file by Wilson. Wilson's inclusion of qualifiers also tends to refute any suggestion that Wilson misleadingly omitted information.

Additional record evidence tends to further refute that Wilson had the intent to purposely mislead the ADA or anyone else for the purpose of ensuring Reitz's prosecution. After Reitz was arrested, Wilson agreed with the ADA to seek the opinion of a local college professor regarding the similarity of the voices before deciding whether to incur the cost of having the recordings examined by a lab. The professor's opinion, although contrary to

Wilson's, appears to have been immediately reported by Wilson to the ADA. And when the ADA then decided the case should be dropped, Wilson dropped it. Accordingly, the summary judgment record fails to support a genuine issue of material fact that Wilson acted intentionally to deceive or with reckless disregard for the truth when preparing his reports.

Under the second prong of *Franks*, an allegedly false statement must be necessary to the finding of probable cause. *See Franks*, 438 U.S. at 156. In performing this analysis, the Court is to "consider the faulty affidavit as if those errors and omissions were removed." *Winfrey*, 901 F.3d at 495. The Court then "must examine the 'corrected affidavit' and determine whether probable cause for the issuance of the warrant survives the deleted false statements and material omissions." *Id.* (quoting *Franks*, 438 U.S. at 156). Probable cause exists if, under the "totality of the circumstances" the facts would "warrant a person of reasonable caution" to find that the accused committed the crime for which he is being arrested. *See id.* (citations omitted).

Here, because there is no genuine issue of material fact concerning whether Wilson provided false or misleading statements under the first prong of *Franks*, there can be no genuine issue of material fact regarding whether Wilson perpetuated a Fourth Amendment violation arising out of his role in supplying information for the warrant. Accordingly, the Court finds that an analysis of Wilson's statements under the second prong of *Franks* is unnecessary. *See Winfrey*, 901 F.3d at 494 (citation omitted). However, to the extent Reitz faults Wilson for the incorrect date of October 13 appearing in the probable cause affidavit, which he did during the summary judgment hearing, there is no evidence that Wilson was

the source for that date. The date of October 13 does not appear anywhere in Wilson's reports. But even if the Court removes the incorrect date per *Winfrey*, the corrected affidavit, reflecting as it does the correct date also, would still support a finding of probable cause.

The Court therefore finds that there is no genuine dispute of material fact on whether Wilson violated Reitz's Fourth Amendment rights by providing false information for the arrest warrant. Because Reitz has failed to demonstrate that a fact issue exists on the false information claim, Wilson is entitled qualified immunity and summary judgment on this claim. *See Aubrey v. Ermatinger,* No. 3:19-CV-0056-B, 2020 WL 7225992, at *10 (N.D. Tex. Dec. 7, 2020), *reconsideration denied sub nom. Vodicka v. Ermatinger,* No. 3:19-CV-0056-B, 2021 WL 1086979 (N.D. Tex. Mar. 22, 2021) (finding that defendant police detective was entitled to qualified immunity where plaintiffs "[did] not raise a genuine issue of material fact regarding whether [police detective] included any false information or omitted material information in his affidavits with deliberate falsity or reckless disregard.").[25]

Finally, through his claim that Wilson falsely arrested him on October 28, Reitz also

---

[25] Although not expressly included in his enumerated claims against Woods (Dkt. No. 67 ¶ 59(a)–(c)), to the extent Reitz might bring a Fourth Amendment claim against Woods on a similar basis (*see id*. ¶¶ 15 & 54), the Court also finds there is no genuine dispute of material fact with respect to whether Woods violated Reitz's Fourth Amendment rights by providing false information for the October arrest warrant. There are no allegations that any statement made by Woods for inclusion in the probable cause affidavit was false or misleading. And no statements provided by Woods in the affidavit are potentially disputable. Further, even if Reitz could find an error attributable to Woods in the affidavit, Reitz has not demonstrated that Woods violated Reitz's clearly established rights through the filing of the initial incident report. *See Melton*, 875 F.3d at 265–66 (granting summary judgment on *Franks* claim because plaintiff had failed to show that deputy officer who filed incident report violated clearly established law). Accordingly, any such claims against Woods are also dismissed.

appears to be arguing that because Wilson did not purportedly believe he had probable cause to arrest Reitz for the crime, Wilson acted unlawfully.

But Reitz's allegations against Wilson for personally arresting him on October 28 do not state a constitutional claim. At the time Wilson arrested Reitz, he did so pursuant to a warrant, the issuance of which required a showing of probable cause. "[P]olice officers acting pursuant to a facially valid judicial warrant enjoy qualified immunity for executing the warrant." *Hart*, 127 F.3d at 445 (citing *Hamill v. Wright*, 870 F.2d 1032, 1036 (5th Cir. 1989)). And as stated above, there is no evidence Wilson procured that warrant through improper means. Further, Reitz makes no argument that the warrant was facially invalid, or that Wilson acted contrary to the warrant's terms when he executed it. For this reason, the Court finds that Reitz has not overcome Wilson's qualified immunity defense. There is no genuine dispute regarding whether Wilson could have reasonably believed that his personal involvement in executing the arrest warrant on October 28 was contrary to clearly established law.

Accordingly, for the above reasons, the Court grants the motion for summary judgment as to all Fourth Amendment claims against Wilson.

2. First Amendment Claim

Similar to the claims brought against Woods, Reitz premises his First Amendment claims against Wilson on alleged attempts to "kill" the KTAB news story, to retaliate against Reitz for exercising his First Amendment rights, and to cover up police misconduct. *See* Dkt. No. 67 ¶ 60(a)–(c). And as is the case with Woods, the summary judgment

evidence fails to demonstrate a genuine dispute on this claim.

Here again, Reitz's only basis for claiming that Wilson intended to stop Reitz from communicating with the reporter is Reitz's own speculation. Through his summary judgment affidavit, Reitz alleges that Wilson "made it clear" that Wilson did not want Reitz cooperating with the reporter and that he wanted Reitz to "'kill' the news story." *See* Dkt. No. 96-2 at 78–79. But Reitz fails to explain how Wilson "made it clear." Reitz apparently inferred Wilson's intent from the way he kept "giving me a hard time" and "the way he was talking to me." *Id.* But this inference is not reasonably supported by the record here.

The Court has considered the recording of Wilson's October 13 call with Reitz, which is part of the summary judgment record. *See* Dkt. No. 78-1 at 2. Importantly, the Court does not consider this recording for purposes of resolving a genuine issue of material fact, but rather to determine whether one exists in the first place.

Wilson begins the call by introducing himself and explaining that "all I'm doing is calling to get your side of the story and if you say you didn't do it, that's all I need to talk to you about." *Id*. Wilson and Reitz discuss alternative explanations for who the caller might have been, including possibly a neighbor or someone Reitz may have cut off in traffic.

Wilson then asks Reitz if Wilson could play the recording of the 911 calls for Reitz, and Reitz replied, "I heard a little tiny bit when I was down there, but my ears were ringing, and it was really hard to hear. But I could tell right away that that wasn't my voice." Wilson then plays the recording over the phone while asking Reitz if he wants him to turn up the

volume. Reitz says that he can hear a little bit but again denies that the voice is his, before adding that he does not have any friends and does not really know anybody.

Wilson then states that he is not a voice expert, but that it seems to him that the caller is "the same person," presumably referring to the caller's voice being similar to Reitz's. Wilson then asks Reitz if he would like to come down to the LEC where he could hear the calls more clearly. Reitz immediately responds, "No, it's not me. I know." Wilson then asks, "Ok, so you have nothing to do with it?" And Reitz responds, "Absolutely not."

Wilson and Reitz have further discussion during the call in which they disagree about whether the evidence from Reitz's phone indicates the 911 calls came from Reitz's phone. Wilson then closes the conversation by stating, "I'm not an expert in voice recognition, but it seems like it's the same person, so if that's your story, we'll just stick with it." Wilson then informs Reitz that he intends to file the charge, provides Reitz with the penal code reference for the charge, advises Reitz to call either the APD or the DA's Office if he has any questions, and finally explains that if Reitz will let him know his attorney's name, Wilson will communicate through his attorney in the future.

Wilson's account of this call is generally consistent with the recording of the call in the summary judgment record. The recording also tends to support Wilson's claim that he only spoke to Reitz the one time, contrary to the multiple conversations Reitz claims the two had.

Conversely, Reitz's account of this conversation with Wilson on October 13 is blatantly contradicted by the recording of that call, and for this reason his account must be

disregarded. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); *see also Lewis v. City of Shreveport*, 765 F. App'x 93, 94 (5th Cir. 2019) (applying *Scott v. Harris* to case involving audio evidence and finding that because audio evidence contradicted plaintiff's claim that he complied with arresting officers, the court had to conclude that the plaintiff resisted arrest).

Reitz appears to allege that Wilson charged him with a crime in retaliation for Reitz's cooperation with the KTAB reporter. Indeed, Reitz testified by deposition that Wilson called him because "[h]e wanted to speak with me about a story that was going to run on KTAB." Dkt. No. 78-1 at 128. But at no time during the recorded call did Wilson even mention the reporter or the news story, nor did Reitz.

Reitz also claims that Wilson told him during the call that Reitz "needed to help him get everything taken care of to his satisfaction." Dkt. No. 96-2 at 79. But Wilson says nothing about doing anything to his satisfaction, other than possibly coming down to the LEC to listen again to the 911 recordings as part of Wilson's investigation into those calls. To the extent anything Wilson said could be construed as a threat to Reitz, it was that Reitz would be charged with a crime if he refuses to cooperate with an ongoing investigation in which he was the sole suspect.

And Reitz's claims that Wilson repeatedly called and harassed him to kill the news

story is unsupported by the summary judgment record. Reitz admits that the October 13 phone call with Wilson was the last time the two spoke. *Id*. But the recording of that call suggests it was also the first time they spoke. Wilson introduces himself at the beginning of the call and Reitz expresses no recognition of him. Nor when Reitz is confronted during that call with repeated requests by Wilson to come to the LEC and listen to the 911 calls does Reitz reference any other conversations with Wilson on the subject. Reitz's only reference to having previously heard the calls or having discussed the calls with the APD is apparently a reference to his listening to the calls with Woods on September 4. If Reitz and Wilson had conversations other than the one recorded on October 13, the summary judgment record fails to support that.

As is the case with Woods, viewing the facts in the light most favorable to Reitz reveals no adverse action by Wilson that was substantially motivated by Reitz exercising his constitutional right to speak to the press. As stated in the prior section, there is no genuine issue of material fact regarding whether Wilson had grounds to investigate and charge Reitz with a crime. For reasons explained above, he did. Thus, even if Wilson personally disliked Reitz and wished to see him charged, Reitz's First Amendment rights are not implicated on these facts because "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." *Keenan*, 290 F.3d at 261–62.

As has been noted, the October 28 arrest was made pursuant to a warrant, the issuance of which required probable cause. Because probable cause existed for the alleged retaliatory conduct (i.e., the charge), Wilson did not violate clearly established law and is

entitled to qualified immunity on the First Amendment claim. *See id*. at 262 ("If probable cause existed, however, or if reasonable police officers could believe probable cause existed, they are exonerated.").

For these reasons, the Court grants Wilson's motion for summary judgment as to the First Amendment claim.

## C. Detective Tatum

Reitz sues Tatum in his individual capacity for wrongful arrest in violation of Reitz's Fourth Amendment rights. Factually, Reitz claims that Tatum signed a false probable cause affidavit leading to Reitz's arrest on October 28, 2015. Dkt. No. 67 ¶ 61(a)–(c).

Tatum has moved for summary judgment based upon qualified immunity and an absence of evidence to support Reitz's claims.[26] Dkt. No. 73 at 1. Tatum has sufficiently invoked qualified immunity and demonstrated the absence of evidence supporting a claim against him to carry his initial summary judgment burden. Therefore, Reitz must present competent summary judgment evidence to show that Tatum violated a statutory or constitutional right, and that the right was clearly established at the time of the alleged conduct. *See Cass*, 814 F.3d at 728.

Tatum signed the probable cause affidavit for Reitz's arrest warrant. But Reitz alleges that Tatum "falsely swore" to the affidavit despite not knowing whether there was

---

[26] In his motion for summary judgment, Tatum defends against the Fourth Amendment claims but also a First Amendment retaliation claim purportedly brought against him. *See* Dkt. No. 74 at 15. However, in his response to the motion, Reitz clarifies that the claims against Tatum are solely those based in the Fourth Amendment and do not include First Amendment claims. *See* Dkt. No. 101-1 at 10.

probable cause to believe Reitz had committed a crime. *See* Dkt. No. 67 ¶ 61(a). Reitz alleges that while Tatum's actions may have been consistent with the routine practices of the Taylor County DA's Office, as described by DA Hicks in his deposition testimony, they were not consistent with the behavior of a reasonable law enforcement officer. Thus, Reitz argues, Tatum is not entitled to qualified immunity. Dkt. No. 101 at 5–6. To support his claims, Reitz relies on Tatum's deposition testimony.

In describing the relevant internal workings of the DA's Office, Tatum testified that it is part of his job description to sign affidavits in support of criminal complaints such as the one at issue here. Dkt. No. 91 at 4. According to Tatum, "clerks [in the DA's Office] get the case and get it prepared, and then it's given to an attorney, and the attorney writes out the probable cause affidavit." *Id.* at 5. Tatum testified that he signs the probable cause affidavit after reviewing it. *Id.*

In this case, Tatum testified that either Wilson or another DA Investigator named Mike Phipps was initially the intended affiant, but Tatum was asked to sign because neither was available. *Id.* at 6. According to Tatum, "[t]hey got [the affidavit] prepared, brought it to me, I read over it, and I signed it." *Id.*

Tatum testified that ADA Phil Crowley supplied the probable cause paragraph for a clerk to include in the Reitz affidavit. *Id.* at 8. According to Tatum, the ADA "goes through the case, reads it and determines if it needs to be dismissed or fill out the probable cause affidavit asking for charges to be filed." *Id.*

Tatum acknowledged that he had no personal knowledge of Reitz or the

investigation of the September 4 events prior to signing the affidavit, nor did he speak with Woods or Wilson prior to signing it. *Id.* at 9–10. But he testified that when "one of our lawyers writes" a probable cause affidavit, he, Tatum, believes the information within it to be "true and correct" and swears to that when he signs the affidavit. *Id.* Tatum testified that this is why he signed the affidavit at issue in this case.

Generally, as discussed above, in the Fourth Amendment context, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Mayfield v. Currie*, 976 F.3d 482, 486 (5th Cir. 2020) (citations omitted). But two exceptions to the independent-intermediary doctrine exist under which officers can be liable for Fourth Amendment violations for their role in the application for and issuance of an arrest warrant. *See id.* at 487.

As previously noted, under *Franks*, an officer can be liable if he "'makes a false statement knowingly and intentionally, or with reckless disregard for the truth' that results in a warrant being issued without probable cause." *Michalik v. Hermann*, 422 F.3d 252, 258 n.5 (5th Cir. 2005) (quoting *Franks*, 438 U.S. at 155–56); *accord Mayfield*, 976 F.3d at 487. A *Franks* claim is appropriate to challenge a "warrant that was not supported by probable cause but that, due to the inclusion of deliberately falsified allegations in the warrant affidavit, appeared to be supported by probable cause." *See Kohler*, 470 F.3d at 1114.

Further, under *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986), "the qualified

immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest" can be lost "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." "The *Malley* wrong is not the presentment of false evidence, but the obvious failure of accurately presented evidence to support the probable cause required for the issuance of a warrant." *Melton*, 875 F.3d at 264; *accord Mayfield*, 976 F.3d 487.

Reitz appears to invoke both *Franks* and *Malley*. *See* Dkt. No. 101-1 at 30–31. In his Third Amended Complaint, Reitz alleges that the affidavit signed by Tatum "was false and so defective as to be in fact fraudulent." Dkt. No. 67 ¶ 61(a).

Reitz's objections to the contents of the affidavit are that:

> The false affidavit, sworn to by Defendant Tatum, incorrectly claimed that Plaintiff had committed misconduct [which was not true] and specifically but incorrectly] stated Plaintiff did that on 13 October 2015 [which was not true; but 13 October 2015 was the date when KTAB ran/published the news story that Defendants were unhappy about....].

*Id*. at 8 n.4.

Later, in his response to Tatum's motion, Reitz elaborates his claims against Tatum, arguing that

> Defendant Tatum knowingly and recklessly and unreasonably and incompetently swore to and signed a false affidavit in this case, and Tatum has admitted to his misconduct, even admitting that when he signed the subject probable cause affidavit [and even much later when he was deposed in this case] Tatum did not know if there was probable cause to conclude that any crime had occurred or that Plaintiff had committed any crime, , and in so doing Tatum falsely charged Plaintiff Reitz with commission of a "phantom crime", a crime that in truth and in fact NEVER occurred; and as a result Plaintiff Reitz was detained and arrested and booked and jailed and charged with that "phantom crime" and criminally prosecuted. Tatum acted

improperly, and is not entitled to 'qualified immunity.'"

*Id*. at 31–32.

Reitz's counsel explained at the summary judgment hearing that the principal thrust of Reitz's Fourth Amendment claim against Tatum is that Tatum "falsely swore" to and "signed off" on the probable cause affidavit without "some personal knowledge" of the facts in the affidavit such that Tatum could form a reasonable belief that Reitz had committed a crime. *See id*; Dkt. No. 101 at 4. Essentially, for Reitz, the key "false" statement in the affidavit is Tatum's attestation that he had "good reason to believe and [does] believe" that Reitz committed a crime.

Tatum argues that a lack of personal knowledge on the part of an affiant law enforcement officer cannot deprive that officer of qualified immunity when the officer otherwise relies on information in the affidavit provided by other officers (assuming that information is not patently unreliable). *See* Dkt. No. 74 at 10–11. Reitz counters that such reliance is reasonable only if the affiant officer personally reviews the reports from which the affidavit facts came, or otherwise has personal knowledge of those facts. *See* Dkt. No. 101-1 at 36.

In essence, Reitz argues that it was unreasonable for Tatum to rely on information provided by the ADA through his draft affidavit even though it is undisputed that the ADA read the relevant police reports and, with the exception of the incorrect date appearing along with the correct date, there is no dispute that the facts in the affidavit came from

those reports.[27] In other words, Reitz would have the Court impose on affiant officers a Fourth Amendment obligation to question the ADA's probable cause determination and verify that it was correct before signing a probable cause affidavit prepared by that ADA. Here, Tatum's failure, according to Reitz, is that he believed the ADA's probable cause determination was credible and swore to that belief.

Reitz's counsel acknowledged during the summary judgment hearing that had Tatum personally reviewed the reports that the ADA had reviewed in preparing the affidavit, the affidavit would then support a finding of probable cause. This admission illustrates that, for Reitz, the primary factual basis for the alleged constitutional violation is the process by which the affidavit was prepared and executed, rather than the affidavit's content or whether that content appeared to support a probable cause determination. However, had Tatum personally reviewed the same reports that ADA Crowley had reviewed, there is nothing in the summary judgment record to suggest that Tatum would have reached a different conclusion. At most, Tatum might have corrected the erroneous date.

Reitz further argues that Tatum could not possibly have determined that probable cause existed because the charging paragraph describes a "phantom crime" that never occurred. By this, Reitz appears to argue that because the charging paragraph erroneously describes the offense as occurring on October 13 rather than September 4, it would be

---

[27] Reitz's arguments to this effect were the only arguments advanced by Reitz at the summary judgment hearing pertaining to his Fourth Amendment claim against Tatum.

impossible for anyone to justifiably believe that the facts in the affidavit supported a conclusion that Reitz committed a crime—because the alleged crime did not occur on October 13.

As explained above, the probable cause affidavit signed by Tatum contained two dates for the offense, one incorrect and the other correct. The incorrect date of October 13 appears in the charging paragraph while the correct date appears immediately following in the probable cause paragraph. Reitz refers to this inclusion of the incorrect date in the affidavit as the "phantom crime." However, there is no dispute that the correct date appears immediately following the incorrect date. As explained elsewhere, this error does not deprive the affidavit of probable cause.

Although Reitz argues that Tatum did not know whether there was probable cause to arrest Reitz when he signed the affidavit, Reitz's counsel was unable at the summary judgment hearing to identify any evidence in the record to suggest that Tatum knew or believed that there was no probable cause when he signed the affidavit. Rather, Reitz appears to emphasize Tatum's lack of personal knowledge of the facts constituting probable cause.

To overcome a qualified immunity defense, a plaintiff must rely on more than bold assertions and bald or conclusory allegations. *Streetman v. Jordan*, 918 F.2d 555, 557 (5th Cir. 1990). Here, Reitz has not demonstrated that a Fourth Amendment violation occurred. There is no summary judgment evidence demonstrating that the probable cause affidavit was in some way materially defective, either due to Tatum's intentional or reckless

inclusion of falsehoods (*Franks*) or due to insufficient evidence (*Malley*), and that the alleged defect deprived the affidavit of probable cause.

While Reitz interprets Tatum's testimony to claim that Tatum intentionally, knowingly, or recklessly signed a false arrest warrant, the testimony and other summary judgment evidence does not support that interpretation, even when viewed in the light most favorable to Reitz.

"Probable cause to arrest an individual exists when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed." *Bennett v. City of Grand Prairie, Tex.*, 883 F.2d 400, 404 (5th Cir. 1989) (internal quotation marks and citations omitted).

Although the affiant must believe he has trustworthy information, "it is undisputed that officers may submit warrant applications containing hearsay, including, of course, information provided by *other officers*." *Id.* at 407 (emphasis added) (footnotes and citations omitted) (citing *Franks*, 438 U.S. at 165; *United States v. Ventresca*, 380 U.S. 102, 111 (1965); *United States v. De Los Santos*, 810 F.2d 1326, 1336 (5th Cir.), *cert. denied*, 484 U.S. 978 (1987); *United States v. Webster*, 750 F.2d 307, 323 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106 (1985)); *see also Manton v. Strain*, 439 F. App'x 328, 330 (5th Cir. 2011) (per curium) ("When preparing a warrant affidavit, an officer may rely upon information from other officers.").

When an officer signs and presents an affidavit prepared by a different officer, the

signor essentially submits a warrant application "attesting to the reliability" of the information provided by the other officer. *Bennett*, 883 F.2d at 407. Probable cause is not eliminated merely because a non-investigating officer signed and submitted the affidavit "as if he was himself attesting to the facts recited." *See id.* at 407–08; *see also Manton*, 439 F. App'x at 329–30 (rejecting plaintiffs' argument that officer who sought arrest warrant "lacked probable cause because he did not have personal knowledge of the investigation's facts.").

Moreover, it is "objectively reasonable" for "an officer who has no personal knowledge of facts asserted in an affidavit" to "rely on information provided by another officer to file a warrant application." *Bennett*, 883 F.2d at 409–10. Additionally, "[a] reasonably competent officer might rely without investigation on information from a trustworthy source such as a prosecutor, especially if the prosecutor indicates that the information comes from law enforcement records." *Hart*, 127 F.3d at 443.[28]

Although Tatum did not have personal knowledge of the facts reflected in the probable cause affidavit, he relied on reasonably trustworthy information provided by the ADA and the officers who investigated the alleged crime. The warrant reflects information from other officers and was signed by an ADA who also drafted the probable cause paragraph after reviewing the case file and officer reports. On this there is no dispute. As

---

[28] In his affidavits offered in connection with Reitz's opposition to the motions of Tatum and Taylor County, Gill opines critically that Tatum "was simply 'signing off' on [the] affidavit because someone handed it to him . . . ." Dkt. Nos. 101-2 at 71, 102-2 at 94. But the record here provides no basis for this opinion or even such an inference. The only evidence on this issue is that Tatum signed the affidavit only after reading it, relying on information provided by the ADA who had reviewed the case file, and believing its contents to be true. *See* Dkt. No. 91 at 9–10.

such, Tatum's affidavit contained sufficient indicia of probable cause to form a reasonable belief that Reitz committed the offense. And Tatum's actions in signing the affidavit under these circumstances were the actions of any reasonable officer. Accordingly, Reitz has not demonstrated that there was anything inherently objectionable in this process such that "the warrant application [was] so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Malley*, 475 U.S. 335 at 344–45.

Further, Reitz presents no summary judgment evidence to show that Tatum knew or had reason to know that information set forth in the arrest warrant was false, or acted with reckless disregard for the truth, such that a *Franks* violation occurred. The allegation that Tatum "falsely" attested that he believed probable cause existed to arrest Reitz because he relied solely on the reports of other officers in reaching that conclusion has no basis in law or fact, for reasons just noted. There is simply no evidence to suggest that Tatum, or any reasonable officer in his position, had reason to doubt the reliability of the information presented in the affidavit such that he was reckless to sign it. *See Hart*, 127 F.3d at 443 (finding that officer who included false statement he received from a prosecutor in affidavit did not act recklessly and was entitled to qualified immunity because a "reasonably competent police officer would have thought that the statement had sufficient internal indicia of reliability to be included in the affidavit without further investigation").

Here, apart from his conclusory allegations of fraud, Reitz has failed to identify any false statements in the affidavit that misleadingly created the appearance of probable cause. *See Kohler*, 470 F.3d at 1114. As his sole textual support for his claim that the affidavit

was false, Reitz highlights for the Court the incorrect date cited in the first paragraph.

The stated date of the 911 calls in the first paragraph is undoubtedly incorrect. But Reitz has produced no evidence that Tatum or anyone else included that error knowingly, intentionally, or with reckless disregard for the truth. Indeed, such an inference appears foreclosed by a review of the affidavit in its entirety. Despite the initial inclusion of the incorrect date in the first paragraph, the correct date appears in the probable cause portion of the affidavit immediately following the first paragraph. Thus, rather than working as subterfuge, the inclusion of the incorrect date in this affidavit, patent as it was, fails to implicate the concerns raised in *Franks* and its progeny that fabricated evidence could be used to falsely establish the existence of probable cause.

Since there is insufficient evidence on this record to conclude otherwise, the only reasonable inference that can be drawn from this record is that the inclusion of incorrect date in this affidavit was unintentional and a mere clerical error. Clerical errors do "not affect the probable cause inquiry." *United States v. Lockett*, No. 05-CR-2002501-KHV, 2005 WL 3845343, at *5 (D. Kan. July 1, 2005); *accord United States v. Henry*, No. 1:08-CR-83, 2009 WL 773649, at *12 (N.D.W. Va. Mar. 20, 2009) (adopting recommendation of Mag. J. finding the wrong date in an affidavit was "not essential to the probable cause determination"), *aff'd*, 673 F.3d 285 (4th Cir. 2012). Moreover, an incorrect date is insufficient to remove the probable cause stated in the arrest warrant. *See United States v. White*, 356 F.3d 865, 869 (8th Cir. 2004). This is in keeping with the longstanding principle that "courts should not invalidate . . . warrant[s] by interpreting affidavit[s] in a hypertechnical,

rather than a commonsense, manner." *Gates*, 462 U.S. at 236 (citing *Ventresca*, 380 U.S. at 109).

For the foregoing reasons, the Court finds that, viewing the facts in the light most favorable to Reitz, no reasonable jury could find that Tatum did anything but sign an arrest warrant based upon reasonably trustworthy information and, in so doing, acted as any reasonable officer would have under the same circumstances. *See Manton*, 439 F. App'x at 329 (affirming grant of summary judgment where plaintiffs failed to demonstrate that arrest affidavit contained false information and rejecting plaintiffs' argument that because the officer who sought arrest warrant did not possess personal knowledge of the investigation's facts, he lacked probable cause). On the particular circumstances presented on this record, Reitz did not have a clearly established constitutional right to only be arrested pursuant to an arrest affidavit where the affiant officer was personally familiar with the facts of his case. And Reitz has failed to establish a genuine issue of material fact that the arrest affidavit lacked probable cause such that a constitutional violation occurred.

Accordingly, the Court grants Tatum's motion for summary judgment and dismisses all claims against him.

## D. Taylor County

Reitz sues Taylor County under *Monell* based upon allegations that Tatum signed a false affidavit in accordance with an unconstitutional policy, practice, and procedure of the County, and that the County ratified the unconstitutional misconduct. Dkt. No. 67 ¶ 62 (a)–(d).

Taylor County has carried its initial summary judgment burden by pointing out an absence of evidence to support a claim against it. Dkt. No. 89 at 1.The burden thus shifts to Reitz to present competent summary judgment evidence to show a genuine factual dispute regarding the merits of his claim against the County.

"[The] purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Juarez v. Aguilar*, 666 F.3d 325, 335 (5th Cir. 2011) (quoting *Wyatt v. Cole*, 504 U.S. 158, 161 (1992)). To hold a municipality liable under § 1983 "requires proof of three elements:  a policymaker; an official policy; and a violation of constitutional rights whose moving force is the policy or custom." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist.*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc) (citations omitted).

Notably, the Supreme Court expressly rejected the premise that a municipality may be held liable under § 1983 based on a *respondeat superior* theory because in enacting § 1983, Congress included a requirement of *actual* culpability—versus constructive or vicarious culpability. *Monell*, 436 U.S. at 693. *See also City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997) (discussing that the municipal liability inquiry under § 1983 should not collapse into a *respondeat superior* analysis).

An official policy may take the form of a formal policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmakers or by an official to whom the lawmakers have delegated policymaking

authority. *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003). In addition, an official policy may also be in the form of "[a] persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that," in effect, "fairly represents municipal policy." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc) (per curiam). In such cases, the custom or practice has the "force of law." *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).

To establish a practice as a policy for § 1983 purposes, Reitz must show that there was "a pattern of abuses that transcends the error made in a single case." *Piotrowski v. City of Houston*, 237 F.3d 567, 582 (5th Cir. 2001). Typically, a single "act is not itself a custom." *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002). Isolated violations are not usually viewed as the "persistent, often repeated, constant violations, that constitute custom and policy" as required for municipal section 1983 liability. *See Bennett v. City of Slidell*, 728 F.2d 762, 768 n.3 (5th Cir. 1984). Moreover, "[p]rior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the specific violation in question." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) (footnotes and citations omitted).

In limited circumstances, "[o]ne way of establishing liability is to show that a policymaker ratified the acts of a subordinate." *Young v. Bd. of Supervisors of Humphreys Cty., Mississippi*, 927 F.3d 898, 903 (5th Cir. 2019). However, this theory is limited to "extreme factual situations." *See Peterson*, 588 F.3d at 847 (collecting cases). "[U]nless

the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009).

Reitz alleges that the policymaker in this case is the Taylor County District Attorney's Office. Dkt. No. 67 at 66. Reitz's theory of municipal liability appears to be based both on the alleged existence of a widespread custom or practice at the Taylor County DA's Office and a theory of ratification of Tatum's actions. However, Reitz has provided no evidence showing the existence of even one case besides Reitz's where the DA Office's warrant application process was the moving force in a citizen's arrest or charging without probable cause. And Reitz also does not allege facts so extreme in Reitz's own case or a constitutional violation so obvious that ratification would be a viable method of establishing a custom or practice.

But regardless of whether Reitz has or can satisfy the first two elements of *Monell* liability and successfully allege the existence of a policy and policymaker, his claim against Taylor County fails for lack of a violation of constitutional rights whose moving force is an official policy or custom. As discussed in the immediately prior section, the summary judgment evidence does not show that Tatum engaged in unconstitutional misconduct or did anything but sign an arrest warrant based on reasonably reliable information.

Section 1983 "is not itself a source of substantive rights; it merely provides a method for vindicating already conferred federal rights." *Flores v. City of Palacios*, 381 F.3d 391,

404 (5th Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979)). Reitz must have "an underlying constitutional or statutory violation" as a "predicate to liability under § 1983." *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1574 (5th Cir. 1989). Reitz has presented no evidence that Tatum signed a false affidavit either knowingly, intentionally, or with reckless disregard for the truth. Tatum, the only defendant in this lawsuit employed by Taylor County, did not violate any constitutional right of Reitz.

Accordingly, the Court grants Taylor County's motion for summary judgment and dismisses all claims brought against the County.

## E. Declaratory Relief

Wilson and Woods request that the Court dismiss Reitz's request for declaratory relief on the grounds that the request adds nothing to the request for monetary relief. Dkt. No. 77 at 25. Tatum and Taylor County do not mention the request for declaratory relief.

As previously stated in this case, *see Reitz*, 2017 WL 3046881 at *5, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, is "an enabling act, which confers discretion on the courts rather than an absolute right on a litigant," *see Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (quoting *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241 (1952)). Furthermore, the Act provides no independent basis for jurisdiction. *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 134 S. Ct. 843, 848 (2014); *Skelly Oil Co. v. Phillips Petro. Co.*, 339 U.S. 667, 671–72 (1950). Unless Reitz has a valid First or Fourth Amendment claim, he has no basis for the Court to issue any declaratory judgment. *See Reitz*, 2017 WL 3046881 at *26 n.9 (relying on *Schilling v. Rogers*, 363 U.S. 666, 677

(1960)). At the same time, "because qualified immunity applies only to claims for money damages," such immunity provides no defense to a claim for declaratory judgment. *Waller v. Hanlon*, 922 F.3d 590, 598 (5th Cir. 2019). Nevertheless, to subject a defendant who is immune from money damages to a trial on a claim for declaratory relief "would undermine the purpose of qualified immunity." *Id.*

Dismissing the underlying substantive claims against Defendants effectively resolves any dispute as to Reitz's request for declaratory judgment against those parties. Declaratory relief is unavailable in the absence of some "judicially remediable right." *Schilling*, 363 U.S. at 677. Without a plausible claim, Reitz has no basis to obtain a declaratory judgment against any party.

## VI. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant Woods and Wilson's motion for summary judgment, dismissing all claims against them. Further, the Court GRANTS Tatum's and Taylor County's motions for summary judgment, dismissing all claims against them.

ORDERED this 2nd day of July, 2021.

_____
JOHN R. PARKER
UNITED STATES MAGISTRATE JUDGE